# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| JEROME PAUL, | Civil No. 10-4759 (JRT/FLN) |
| Plaintiff, | **AMENDED REDACTED MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| METROPOLITAN COUNCIL, | |
| Defendant. | |

Richard A. Williams, Jr., **R.A. WILLIAMS LAW FIRM, P.A.**, 2400 West County Road D, Suite 110, St. Paul, MN 55112, for plaintiff.

Susan E. Ellingstad and Anna M. Horning Nygren, **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; Ann K. Bloodhart, **METROPOLITAN COUNCIL**, Office of the General Counsel, 390 Robert Street North, St. Paul, MN 55101, for defendant.

Plaintiff Jerome Paul was terminated in 2010 from his position as a bus operator for Metro Transit, an operating unit of defendant Metropolitan Counsel,[1] after accumulating three "debits" under Metro Transit's disciplinary policy. Paul's complaint alleges race discrimination and retaliation in violation of Title VII, Section 1983, and the Minnesota Human Rights Act ("MHRA"). Metro Transit has moved for summary judgment on all of Paul's claims. Because Paul fails to make out a prima facie case of

---

[1] For the sake of readability, the Court will refer to defendant as "Metro Transit."

race discrimination or retaliation, and because the MHRA claims are time-barred, the Court will grant the motion.

## BACKGROUND

### I. METRO TRANSIT: ORGANIZATION, OPERATION, AND DISCIPLINE

Metro Transit provides public transportation – bus, light rail, and commuter rail services – for the Twin Cities. It operates a fleet of 885 buses and employs approximately 1,409 bus and light rail operators. *About Metro Transit*, http://metrotransit.org/about-metro-transit.aspx; *Facilities & People*, http://metrotransit.org/facilities-people.aspx. Metro Transit's Customer Relations Department fields complaints from customers at a central call center. (*See* Aff. of Susan Ellingstad, Ex. 2, at 1771-72, Apr. 30, 2012, Docket No. 25.)

It is essential to Metro Transit's operation that buses run on time. (*Id.*, Ex. 7 at 2021; Ex. 2 at 1771.) Each bus operator is issued a copy of Metro Transit's Bus Operator's Rule Book & Guide, which contains detailed rules about operating on schedule. (*Id.*, Ex 2, at 1764, 1841, 1776.) Bus operators are instructed to notify a supervisor whenever they are more than ten minutes late leaving a terminal, or if the driver will be more than ten minutes late arriving at a relief point. Moreover, "[s]tops for personal reasons such as purchasing food or coffee are expressly prohibited whether or not customers are on board [the] bus." (*Id.* at 1807-09.) A supervisor contacts by radio bus operators who have left the terminal more than several minutes late. (*See id.*, Ex. 3.)

Metro Transit uses a three-step, progressive discipline system: written warning, final written warning, and termination. (*Id.*, Ex. 12, at 2259, 2262.) Bus operators may receive written warnings in three categories: customer relations,[2] Operator Adherence Code violations, and safety. (*Id.*, Ex 12, at 2259; Ex. 13.) Written warnings in any of the three categories accrued within a rolling calendar year can result in a "debit." (*Id.*, Ex 12, at 2262; Ex 13.) Accumulating three debits within a rolling calendar year is just cause for termination under the policy. (*Id.*, Ex. 13.)

## II. PAUL'S TERMINATION AND HISTORY OF DISCIPLINE

Jerome Paul worked as a bus operator from February 5, 1996 until his termination on March 15, 2010. Paul previously filed discrimination complaints against Metro Transit with the Equal Employment Opportunity Commission ("EEOC") in 2004 and again in 2007. (*Id.*, Ex. 1, at 183, 185.) On both occasions the EEOC issued Paul a right to sue letter, though Paul took no further action. (*Id.*, Ex. 1, at 186-88; Exs. 42, 44.)

Pursuant to Metro Transit's progressive discipline policy, Paul was terminated on March 15, 2010 for accumulating three debits within a thirty-six month period.[3] (*Id.*, Ex. 45.) Paul received the first debit after receiving a Record of Warning on

---

[2] All customer complaints are either reviewed with the bus operator, placed in a customer service database, or "filed" – meaning that a verbal or written warning is recorded in the bus operator's work history. (*Id.*, Ex. 13; Ex. 12, at 2262.) Only verified, "filed" complaints count toward progressive discipline. (*Id.*, Ex. 12, at 2262.) The third filed customer complaint within a rolling calendar year results in a written warning; a "Final Record of Warning" is issued after the sixth filed customer complaint; and a bus operator may be terminated after the eighth filed customer complaint. (*Id.*, Ex. 13; Ex. 12 at 2262.)

[3] During his last twelve months of employment, Paul accumulated eight customer complaints, six operating violations, and violations for insubordination and falsification. (*Id.*, Ex. 20; Ex. 27.)

November 15, 2009 for operating the bus late on two occasions – one on June 7, 2009 after leaving the terminal eight minutes late, (*id.*, Ex. 21; Ex. 20), and another on November 15, 2009 for departing the terminal five minutes late (*id.*, Ex. 35, at 1284; Ex. 20).

The second debit came on January 5, 2010 after Paul accumulated three filed customer complaints within a rolling calendar year. (*Id.*, Ex. 50.) The complaints alleged that Paul pulled over to talk on the phone and caused his bus to be late (*id.*, Ex. 23), drove past a customer on his route and was subsequently rude when the customer boarded the bus (*id.*, Ex. 51), and parked his bus with customers on board to walk into a building for over seven minutes without explanation (*id.*, Ex. 25, at 1611). In each case, Paul's supervisor Lynn Beauclaire contacted the customer to verify that the complaint was credible before filing it and, in the case of the last violation, viewed the bus video tape to assess the accuracy of the complaint. (*Id.*, Exs. 51, 23 and 28, at 3061.)

Metro Transit issued the final debit on February 10, 2010 after Paul received a Final Record of Warning for a late terminal departure. (*Id.*, Ex. 52.) In this instance, Paul contacted a supervisor to report that he was arriving late to the terminal and needed to use the restroom. (*Id.*, Ex. 53.) Paul then parked the bus in front of the garage (*id.* at 1647), causing the safety buzzer to sound constantly for six minutes, until a supervisor moved the bus to its proper location and went in search of Paul (*id.*, Ex. 28 at 3062; Ex. 68). Paul eventually returned, and, following a disagreement, the Transit Supervisor told him to start his route or he could be disciplined. (*Id.*, Ex. 28 at 3063; Ex. 68.) Paul pulled the bus out of his parking spot as if to leave, but then parked it in the pedestrian

loading area, exited the bus for several minutes, and when he returned called Metro Transit's Control Center to report that a supervisor was harassing him and to request the bus video. (Ex. 28, at 3063; *id.*, Ex. 68.) Paul eventually departed, though because of the delay, his bus did not complete its route. (*Id.*, Ex. 28 at 3063.)

The supervisors who issued the violations resulting in Paul's termination claim not to have been aware of Paul's prior discrimination complaints when they issued the discipline. (Aff. of D.C. ¶¶ 4, 8, Apr. 30, 2012, Docket No. 24; Aff. of M.R. ¶ 8, Apr. 30, 2012, Docket No. 23; Aff. of Lynn Beauclaire ¶ 5, Apr. 30, 2012, Docket No. 26.)

Paul grieved his termination, and Metro Transit offered to reinstate Paul to his position subject to a Last Chance Agreement, which required Paul to comply with Metro Transit's operating procedures. (Ellingstad Aff., Ex. 28 at 3066-67.) Paul rejected the offer, the matter went to arbitration, and the arbitrator ultimately denied Paul's grievance, concluding that the three debits were supported by the evidence and that just cause supported the discharge. (*Id.*, Ex. 28 at 3067.)

Paul filed a complaint with the EEOC and the Minnesota Department of Human Rights on August 3, 2010 alleging race discrimination and retaliation. (*Id.*, Ex. 54.) The EEOC issued a right to sue letter on August 31, 2010, and Paul filed this action on November 30, 2010. (*Id.*, Ex. 55.)

## III. EVIDENCE OF DISCRIMINATORY TREATMENT

Paul testified that a supervisor used racial slurs in a December 2004 conversation with Paul regarding a customer service call. (*Id.*, Ex. 1, at 24-25.) This supervisor was

the only supervisor ever to do so (*id.*, at 28-29), and he last supervised Paul in 2006 (*id.* at 24-25). Paul also points to an October 14, 2009 internal memorandum, which reversed as not in line with Metro Transit policy discipline that Lynn Beauclaire issued to Paul. (Aff. of Richard A. Williams, Jr., Ex. 19, May 22, 2012, Docket No. 29.) Specifically, Beauclaire issued a Final Record of Warning following two filed customer complaints, but Metro Transit Policy required "three customer complaints or management prerogative to jump progression." (*Id.*) While Metro Transit's Assistant Director of Garage Operations observed "serious issues and concerns with the safe operation of the bus by Mr. Paul," he removed the Final Record of Warning for the customer complaints.[4] (*Id.*) Finally, Paul testified that Metro transit filed complaints against Paul on days when he was not working. (Ellingstad Aff., Ex. 1, at 190-193.)

## ANALYSIS

### I. STANDARD OF REVIEW

#### A. Motion for Summary Judgment

Metro Transit moves for summary judgment. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party demonstrates that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that

---

[4] The two customer complaints stemmed from Paul's admitted use of a cell phone. In viewing the surveillance videos to assess the accuracy of the complaints, Beauclaire observed several other safety violations, and disciplined Paul for (1) cell phone use, (2) failing to stop at a railroad crossing, (3) moving the bus with the front door open, (4) inattentive driving, and (5) failing to call any streets. (*Id.*) The Union objected to issuing multiple violations for conduct occurring in one day, rather than grouping all offenses into one violation, and further objected to Beauclaire's "random pulling of videos" in an apparent attempt to "trap" Paul. (*Id.*)

- 6 -

it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the movant identifies those portions of the record which it believes demonstrate the absence of a genuine issue of material fact, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

## II. METRO TRANSIT'S SUMMARY JUDGMENT MOTION

Paul's five-count complaint alleges race discrimination and retaliation in violation of Section 1983, Title VII, and the MHRA. In his opposition brief, Paul responds to virtually none of Metro Transit's arguments, and appears only to oppose summary judgment as to the race discrimination claim. The Court will grant Metro Transit's motion as to the MHRA claims because they are time-barred, and as to the discrimination and retaliation claims because Paul has failed to make out a prima facie case of discrimination or retaliation.

### A. Minnesota Human Rights Act Claims (Counts III and V)

MHRA claims must be filed within forty-five days of the prospective plaintiff's receipt of notice from the Minnesota Department of Human Rights ("MDHR") that the

department is dismissing the charge. Minn. Stat. § 363A.33, subd. 1. A letter dated September 14, 2010 informed Paul that the MDHR had dismissed his case. (Ellingstad Aff., Ex. 56.) Paul filed suit on November 30, 2010, approximately seventy-five days after the date of the dismissal notice. Therefore, the Court will dismiss Paul's MHRA claims as time-barred. *See* Minn. Stat. § 363A.33, subd. 1.

> **B. Race Discrimination in Violation of Title VII and Section 1983**
> (Counts I and II)

Paul alleges race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Paul can survive summary judgment either by offering direct evidence of discrimination or by creating an inference of discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Paul appears to proffer no direct evidence of discrimination, and so *McDonnell Douglas* applies.[5] The *McDonnell Douglas* burden-shifting framework applies equally to Paul's Title VII and section 1983 claims of race discrimination. *See Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992).

---

[5] Paul purports to rely on the racial slurs allegedly uttered by a supervisor in December 2004 as "background" to frame the later allegations of discrimination. Because the conduct occurred more than 300 days before Paul's filing of the charge with the EEOC, the alleged 2004 racial slurs do not constitute direct evidence of discrimination in this case. *See* 42 U.S.C. § 2000e-5(e)(1); *Woodson v. Int'l Bhd. of Elec. Workers*, 974 F. Supp. 1256, 1259 (D. Minn. 1997). Paul does not argue that the alleged 2004 incident was part of an ongoing violation that continued through the running of the limitations period, and the record would not support such a finding. *See Kline v. City of Kansas City, Fire Dep't*, 175 F.3d 660, 664-65 (8th Cir. 1999) (observing that a claim may be timely if rooted in an ongoing violation, which must be an ongoing pattern rather than a collection of discrete instances).

To establish a prima facie case of race discrimination, Paul must show (1) that he is a member of a protected class, (2) that he was meeting his employer's legitimate job expectations, (3) that he suffered an adverse employment action, and (4) "similarly situated employees outside the protected class were treated differently." *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (quotation marks and citation omitted). If Paul makes out a prima facie case of discrimination, the burden shifts to Metro Transit to produce a legitimate, non-discriminatory reason for the adverse action. Paul must then present evidence that creates a fact question as to whether Metro Transit's rationale was mere pretext for unlawful discrimination. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005).[6]

The first and third elements of Paul's prima facie case are not disputed: Paul is black, and Metro Transit fired him from his post as a bus operator. The central issues are

---

[6] It is unclear whether Paul also seeks to employ a disparate impact theory of proof. Such a theory of proof may be used to show discrimination where the employment criteria is facially neutral but allegedly falls more harshly on a protected class of employee. *Int'l B'hood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). To prove discrimination on a disparate impact theory, the plaintiff must (1) identify a facially neutral employment practice, (2) demonstrate a disparate impact on the protected group to which he belongs, and (3) show a causal connection between the two. *Mems v. City of St. Paul*, 224 F.3d 735, 740 (8th Cir. 2000), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043. To show causation, the plaintiff must initially offer probative statistical evidence showing that the challenged practice has a substantial impact on a protected group. *See Lewis v. Aerospace Cmty. Credit Union*, 114 F.3d 745, 750 (8th Cir. 1997).

To whatever extent Paul relies on a disparate impact theory, the theory cannot survive summary judgment on this record. Paul has neither identified any specific employment practice alleged to have a disparate impact, *see Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 800 (5th Cir. 1982); (*see also* Ellingstad Aff., Ex. 1, at 133), nor has he offered statistical evidence showing causation, *see Lewis*, 114 F.3d at 750 (dismissing disparate impact claim for failure to present adequate statistical evidence).

whether Paul has raised material fact questions as to whether he was meeting Metro Transit's legitimate job expectations, and that similarly situated employees outside the protected class were treated differently.

Metro Transit points to a host of record evidence, only some of which is summarized above, showing that Paul was not meeting its legitimate employment expectations. In his last twelve months of employment alone, for example, Paul accumulated eight customer complaints, six operating violations, and citations for insubordination and falsification. As to this prong of his prima facie case, Paul points only to Metro Transit's offer to reinstate him as evidence that he was meeting Metro Transit's employment expectations. Paul's reliance on this evidence is misplaced. The offer of reinstatement cannot reasonably be construed as evidence that Paul was meeting expectations. Rather, Metro Transit plainly offered to reinstate Paul in an effort to settle his grievance prior to arbitration. Indeed, that the proposed "Last Chance Agreement" required Paul to comply with Metro Transit's Operating Procedures suggests that Paul was **not** meeting legitimate expectations. Moreover, even if the reinstatement offer could creatively be construed as evidence that Paul's performance was up-to-par, it is insufficient to raise a genuine fact question in the face of a record replete with evidence to the contrary. (*See, e.g.*, Ellingstad Aff., Exs. 20, 27, 64.)

As to the remaining element of Paul's prima facie case of discrimination, Paul appears to argue that the record supports an inference that he was treated differently than employees outside the protected class because (1) a supervisor called Paul racially charged names in December 2004, (2) supervisor Lynn Beauclaire allegedly failed to

follow policy in disciplining Paul – including by "randomly" pulling videos – and attempted to accelerate the progressive discipline process, and (3) Metro Transit received five customer complaints on days when Paul was not working.[7]

First, Paul's allegation that a supervisor called him racially charged names in December 2004 is insufficient to create a jury issue as to whether race-related animus played a role in Paul's discharge because, having last overseen Paul in 2006, this supervisor played no role in the discipline that led to Paul's termination. *See, e.g., Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 673 (8th Cir. 1995) (statements by non-decision-makers are insufficient to show a discriminatory component of an adverse employment action).

Second, in support of his argument that Beauclaire violated Metro Transit policies and accelerated the discipline process in order to prematurely fire him, Paul points only to the October 14, 2009 internal memorandum rejecting a June 15, 2009 Record of Final Warning as not compliant with Metro Transit policy. Paul argues that because the June 15, 2009 Record of Final Warning issued by Beauclaire was ultimately dismissed,

---

[7] In opposing summary judgment, Paul appears not to press his apparent claims that some Caucasian bus operators were disciplined less harshly than him. Regardless, Paul has not identified any such operators with a similar number of late departures, (Ellingstad Aff., Ex. 1, at 124), and the only specific operator to whom Paul apparently refers was not similarly situated. Paul testified that the operator, J.B., struck a customer while talking on his cell phone and did not lose his job. (*Id.* at 131.) J.B., however, was not similarly situated to Paul because he operated out of a different garage, was supervised by different supervisors, was terminated in 2009 after the accident, and – though later reinstated – his reinstatement was subject to harsh discipline including a 240 hour unpaid suspension, and approved in light of J.B.'s near perfect driving record for the preceding thirty-six months. (*Id.*, Ex. 58); *see also Chism v. Curtner*, 619 F.3d 979, 984 (8th Cir. 2010) ("When different decision-makers are involved in terminating employees, the employees are rarely similarly situated in all relevant respects."), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043.

and because Beauclaire was the supervisor that later imposed the discipline resulting in Paul's termination, a jury could reasonably infer that Beauclaire was motivated by racial animus. The Court finds this linkage far too tenuous to support a reasonable inference of discriminatory animus. Moreover, Paul points to no record evidence showing that Beauclaire deviated from company policy in issuing the violations leading to his termination, or to evidence showing that Beauclaire "randomly" pulled videos in an effort to "entrap" him.

Finally, Paul claims that five customer complaints were filed against him for incidents occurring on days when he was not working. Because Paul does not dispute that the customer complaints leading to his debits and ultimate termination involved him, the five additional complaints he references appear to be irrelevant. Regardless, Paul points to no evidence showing that Metro Transit considered these five complaints in deciding to terminate him.

In sum, Paul marshals **no** evidence upon which to base a reasonable inference that he was meeting Metro Transit's legitimate expectations, that any of the discipline leading to his termination was improper, or that similarly situated employees outside the protected class were treated differently. Paul has therefore failed to make out a prima facie case, and Metro Transit's motion for summary judgment will be granted.

### C. Title VII Retaliation Claim (Count IV)

To establish a prima facie case of retaliation under Title VII, Paul must show (1) that he engaged in a protected activity, (2) he suffered an adverse employment action,

and (3) a causal connection between the protected activity and the adverse employment action. *Shanklin*, 397 F.3d at 603. The retaliation claim appears to be based on Paul's belief that each instance of discipline he has received since 2004 is a result of his filing discrimination complaints in 2004 and 2007. Paul alleges, for example, that after filing the discrimination complaint in 2004, he began "to be more harassed by Caucasian supervisors, and everything I did from that point on was . . . filed . . . It didn't matter what it was." (Ellingstad Aff., Ex. 1, at 190, 194.)

Yet Paul has pointed to no record evidence raising a genuine fact question as to the hypothesized connection between his discrimination complaints and the discipline he received as an operator. First, three years passed between Paul's 2007 complaint and his termination. *See, e.g.*, *Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008) (finding that six months between protected activity and alleged retaliatory action was insufficient to raise an inference of a causal connection). Second, and more importantly, the record suggests that the supervisors who issued the violations to Paul resulting in his termination were unaware of Paul's protected conduct, and Paul points to no evidence to the contrary. *See Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 715 (8th Cir. 2000) ("A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation."). In sum, Paul has failed to show that a genuine fact issue exists regarding the causal connection between his termination and his prior discrimination complaints, and so failed to make out a prima facie case of retaliation. Accordingly, Metro Transit's motion will be granted.

## CONCLUSION

Paul has failed to make out a prima facie case of discrimination or retaliation, and his MHRA claims are time-barred. The Court will therefore grant Metro Transit's motion for summary judgment.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's Motion for Summary Judgment [Docket No. 20] is **GRANTED.** The parties must show cause on or before twenty (20) days from the date of this Order why the Court should not unseal the Order, and specify any portion of the order warranting redaction.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: July 25, 2012　　　　　　　　　　　____s/ John R. Tunheim____
at Minneapolis, Minnesota.　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　United States District Judge